1

1  **UNREDACTED TRANSCRIPT**

2

3  IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF TENNESSEE
   EASTERN DIVISION

4

5  UNITED STATES OF AMERICA        .
                                   .
6  VERSUS                          .   NO. 1:08-CR-10102-JDB-1
                                   .   JACKSON, TENNESSEE
7  MICHAEL R. LEMONS               .          1:20 P.M.
                                   .
8  . . . . . . . . . . . . . . . .

9

10

11              APPEAL TRANSCRIPT
         SENTENCING HEARING PROCEEDINGS
12                MAY 13, 2010

13

14       BEFORE THE HONORABLE J. DANIEL BREEN,
         UNITED STATES DISTRICT COURT JUDGE

15

16                  APPEARANCES

17  FOR THE UNITED STATES:       MR. JERRY R. KITCHEN
                                 ASSISTANT U. S. ATTORNEY
18                               300 FEDERAL BUILDING
                                 109 SOUTH HIGHLAND AVENUE
19                               JACKSON, TENNESSEE 38301

20

21  FOR THE DEFENDANT:           MS. M. DIANNE SMOTHERS
                                 ASSISTANT FEDERAL DEFENDER
22                               105 FEDERAL BUILDING
                                 109 SOUTH HIGHLAND AVENUE
23                               JACKSON, TENNESSEE 38301

24  COURT REPORTER:              CHRISTINE MARTIN, OCR, RPR
                                 P. O. BOX 10373
25                               JACKSON, TENNESSEE 38308

1              (Defendant present)

2                   **THE COURT**:   All right, we're set this afternoon

3     in the matter of U. S. versus Michael Lemons, 08-10102.

4                   Is the government ready to proceed this

5     afternoon?

6                   **MR. POWELL**:   Yes, Your Honor.

7                   **THE COURT**:   Is the defendant ready to proceed?

8                   **MS. SMOTHERS**:   Yes, sir.

9                   **THE COURT**:   All right, counsel, I've received

10    and reviewed your -- well, the presentence report as well

11    as your position papers.

12                  Mr. Powell, did you have any -- I don't think

13    there were any objections by the government, was there,

14    sir?

15                  **MR. POWELL**:   No, Your Honor.

16                  **THE COURT**:   Did you have anything you needed to

17    take up?

18                  **MR. POWELL**:   We have four exhibits.   They are

19    numbered sequentially 1 through 4, and they are,

20    respectively, the waiver in indictment number 9311 from

21    Maury County, judgments in those -- count 1 and count 2 in

22    that same case, and then a reporter's transcript of the

23    entry of the plea of guilty dated February 2, 1996.

24    Ms. Smothers and I each have copies, and I have prepared

25    these copies and we are submitting them to the court with

1    no objections.

2              **THE COURT:**  No objections?

3              **MS. SMOTHERS:**  No, sir, Your Honor.

4              **THE COURT:**  All right, Ms. Smothers, let me go

5    ahead and take up your objections that you've lodged in

6    this matter.  I believe you had --

7              **MS. SMOTHERS:**  Yes, sir, Your Honor.

8              **THE COURT:**  Paragraph 15?

9              **MS. SMOTHERS:**  Yes, sir.  And we still maintain

10   our objections as we have basically set them out, Your

11   Honor.  I don't know that I can add a tremendous amount by

12   way of argument to Your Honor today.  I think we've

13   basically set out the basis for our argument.

14             We had initially -- I think Mr. Powell and I

15   both initially, after extensive contact with the Maury

16   County court system, with the clerk and the office of the

17   clerk, had not had documentation, as you can see from my

18   objections themselves.  They're simply -- We simply had a

19   copy of the judgment, and that was all that we had at that

20   point, which indicated *pro se*, that there was nothing

21   behind it that had been provided, and we have requested

22   repeatedly for that documentation, and it simply wasn't

23   provided.

24             The documentation we did receive which did

25   exist is what Your Honor now has as exhibits 1, 2 and 3.

1   I, nevertheless, maintain our objections.  Obviously, he

2   did sign a waiver of counsel.  There's a little X mark

3   there on the box and he's signed that document as far as

4   the waiver of a jury trial and, I think, proceeding by

5   information in that case.

6           I would like to call Mr. Lemons just very

7   briefly about the circumstances of this event and that plea

8   for the record if we could do that, and I think that's

9   basically the proof we would want to present.  I'd like to

10  be heard as far as disposition with some other matters, but

11  if I could call him briefly.

12          **THE COURT:**  All right, come around.

13       **MICHAEL LEMONS, THE DEFENDANT, WAS DULY SWORN**

14                    **DIRECT EXAMINATION**

15  **BY MS. SMOTHERS:**

16  Q    Let me ask you, you're Mike Lemons; correct?

17  A    Yes, ma'am.

18  Q    Michael Lemons.

19       Let me ask you to go back, if you would, and I know

20  this is quite a ways back, but back in 1996 in Maury

21  County, did you appear in court about some burglary

22  petitions?

23  A    Yes, ma'am.

24  Q    How did you get there?  I mean physically.

25  A    I was on probation out of Jackson.  I was working at

1    a place called Club Alibi outside of Jackson, Tennessee.

2    And at night, whenever I got off work, I was walking to a

3    girl's house that I was dating.  She lived in an apartment

4    complex.  There had just been a fight up there at the

5    apartment complex, and police officers were leaving there,

6    and they saw me walking on the street, on the side of the

7    road, and it was probably about two o'clock in the morning,

8    and picked me up.  When they did, I didn't have any ID on

9    me, so they asked me my name, and I told them my name was

10   Michael Lemons, and they ended up running an NCIC and had a

11   hit for a fugitive from justice out of Maury County,

12   Tennessee.

13   Q    And when you said you were on probation here, is that

14   the burglary case that was in Madison County back in '94?

15   A    Yes, ma'am.

16   Q    Okay.  So were you taken to jail here, then to Maury

17   County, or what?

18   A    I was taken to jail in, I think, Lexington.  I think

19   that's where -- I don't remember exactly which town it was.

20   I think it was Lexington.  I was taken there.  I sat there

21   for about two or three days before Maury County came and

22   got me.

23   Q    So did you then go to the Maury County jail?

24   A    Yes.

25   Q    Do you recall how long you were there before you ever

```
 1   were in court about that case?
 2   A    I went to court one time and was there for roughly
 3   about a month, maybe a few weeks to a month.
 4   Q    Before you went to court, you mean?
 5   A    Yes, ma'am.
 6   Q    Okay.  So your recollection is you actually appeared
 7   in court one time.
 8   A    Yes, ma'am.
 9   Q    And the whole thing was done in one day, one event.
10   A    Yes, ma'am.
11              MS. SMOTHERS:  Your Honor, might I show him the
12   exhibits?
13              THE COURT:  You want the transcript too?
14              MS. SMOTHERS:  Yes, sir, Your Honor, just --
15   BY MS. SMOTHERS:
16   Q    I'm showing you exhibits 1, 2, 3 and 4.
17              THE COURT:  You can put them on the screen.  I
18   assume they've already been marked.
19              MS. SMOTHERS:  Yes, sir, Your Honor.
20              THE COURT:  That way everybody can see them.
21              MS. SMOTHERS:  Okay.  If I can get them to fit.
22   BY MS. SMOTHERS:
23   Q    This has been marked as exhibit 1, "Waiver of Trial
24   by Jury and Petition to Enter Plea of Guilty."  Do you
25   recall who filled in or do you know who filled in this top
```

1    information?

2    A      No, ma'am.

3    Q      Okay.  You don't recall that you did it.

4    A      No, ma'am.

5    Q      Okay.  This is a two-sided document.  I'm showing you

6    the backside of that document.

7              THE COURT:  You might want to pull it up a

8    little bit.

9              MS. SMOTHERS:  Yes, sir.  It's a little

10   difficult to read.

11   BY MS. SMOTHERS:

12   Q      Again, there's some language at the top.  It sets out

13   the recommendation for the punishment.  But looking at

14   this, 6 February of '96 and this signature, whose signature

15   is that?

16   A      The signature is definitely mine.

17   Q      Okay.  Do you know if you filled out any of the other

18   items other than the signature?

19   A      By looking at the February and the 6th, no, they

20   shouldn't be mine.

21             THE COURT:  Should or should not?

22             THE WITNESS:  Should not.

23   BY MS. SMOTHERS:

24   Q      And let me just ask you, and these documents

25   reference it but your signatures are not on any other

1    items.  What sentence do you recall getting?  What was the

2    punishment?

3    A     What they gave me was five years -- as I understand,

4    they gave me five years on top of the Jackson probation to

5    run together, which gave me a total of thirteen years

6    intense probation.  I had eight out of Jackson already.

7    The reasoning was that that charge happened before, the one

8    in Jackson.

9    Q     And where were you to actually be supervised?

10   A     In Jackson, Tennessee.

11   Q     Where were you living at that time?

12   A     In Jackson.

13   Q     So you weren't in Maury County at the time.

14   A     No.

15   Q     When you went to court -- You said you went to court

16   that first time.  Let me ask you first, how old were you

17   when you did this plea?

18   A     I'd say 19 years old.

19   Q     Okay.  At that time --

20   A     Nineteen, twenty.

21   Q     Okay.  At that time, was there any problem that you

22   were having as far as personal with drug use, alcohol use,

23   that type of thing?

24   A     No, ma'am.

25   Q     Had you graduated high school?

1    A      No, ma'am.  I graduated from Knoxville Job Corps in

2    '89 in Knoxville.

3    Q      Is that like a GED or is that some other --

4    A      GED.

5    Q      GED.  All right.  So you had that.

6    A      Yes, ma'am.

7    Q      You can read and write then.  That's not an issue.

8    A      Yes, ma'am.

9    Q      Do you recall about, from your recollection, how long

10   you were in court?  I mean an hour, all day, ten minutes,

11   what?

12   A      It wasn't very long.  I'd say maybe five, ten

13   minutes, just long enough for them to tell me what I got,

14   then they released me ROR, I guess.

15   Q      You were to report to somebody back here in Madison

16   County --

17   A      Yes.

18   Q      -- or were you already being supervised here?

19   A      I was already being supervised here in town, and they

20   were supposed to contact my probation officer in Jackson

21   and let him, I guess, add the five years to it, I guess, or

22   whatever.

23   Q      You said you sat for about a month, or several weeks

24   at least, in the Maury County jail before you went to

25   court.

```
1    A      Yes, ma'am.

2    Q      Did you ever during that period of time speak to a

3    lawyer?

4    A      The only other person I talked to was the

5    investigators.  The investigators are the ones that came

6    and talked to me from the beginning.

7    Q      When you say the investigators, you mean from the

8    sheriff or police?

9    A      Yes, ma'am.

10   Q      Law enforcement officers.

11   A      Yes, ma'am.

12   Q      Okay.  Did you ever -- Before you were standing in

13   court, did you ever speak with the prosecuting attorney

14   about the charges or what the options were --

15   A      No, ma'am.

16   Q      -- before you were there?  Okay.

17          And when you were in court -- Obviously, we see the

18   paperwork, and it says, I'm waiving my right to counsel.

19   Do you recall a public defender or any attorney of that

20   type being there in court?

21   A      No, ma'am.

22   Q      Was anyone else in court other than you in your case?

23   A      Yeah, the courtroom was full of people, but I never

24   talked to anybody else.  I didn't even remember signing the

25   paperwork, you know.
```

1    Q      How did you get -- This may sound like a strange

2    question, but how did you get home?  What happened after

3    you left the courtroom?

4    A      Okay, whenever I left the courtroom, I -- I'm from

5    Jackson, Tennessee.  I never even remember being in Maury

6    County.  And I asked them, Well, how do I get back to

7    Jackson?  And they told me to go to the nearest church,

8    that there was a church down the road in town, and I went

9    to the church, and the church was able to get me a bus

10   ticket.  The pastor carried me to the bus station and got

11   me a bus ticket and waited for me to be able to get on the

12   bus to get back to Jackson.

13   Q      Okay, so you came back home, back to Jackson.

14   A      Yes.

15   Q      And that's the last contact you had with Maury

16   County --

17   A      Yes.

18   Q      -- about any of that.

19   A      Yes, ma'am.

20   Q      All right.  Do you recall the judge explaining to you

21   as you were going through this process that if you pled

22   guilty and got convicted, if you got in trouble later you

23   could get -- it could cause you more trouble, get you a

24   worse sentence or make you in a higher category or anything

25   like that?

```
 1   A      Through them, no.  I was under the impression it was

 2   all going straight to Jackson.  Of course, if I did

 3   anything in that county, you know, it would go through

 4   Jackson and be violated there.  But as to Maury County, I

 5   had no other tie-in as far as I knew.

 6   Q      Why did you -- I mean you're 19 years old.  Why did

 7   you sign these papers?

 8   A      I don't know.  I don't know.  Maybe the deal sounded

 9   too good.  I don't know.

10   Q      Did you know what would happen if you didn't sign

11   them?  Did you have a thought as to where you would be if

12   you didn't sign them?

13   A      No.

14   Q      Okay.

15              MS. SMOTHERS:  I think that's all I have, Your

16   Honor.

17              THE COURT:  Mr. Powell?

18              MR. POWELL:  No questions, Your Honor.  Thank

19   you.

20              THE COURT:  You can step down, sir.

21              Any additional proof you want to present?

22              MS. SMOTHERS:  No, sir, Your Honor.

23              THE COURT:  So is it my understanding that

24   basically the objection is to the extent that the

25   defendant -- it all revolves around this conviction that
```

1    occurred in Maury County?

2              **MS. SMOTHERS:**  Yes, sir, Your Honor.

3              **THE COURT:**  Mr. Powell, I'll hear from you.

4              **MR. POWELL:**  Your Honor, I don't have anything

5    to add.  There's nothing to indicate these aren't valid,

6    knowing, voluntary pleas that were entered by the

7    defendant, valid judgments that were entered in Maury

8    County, and the presentence report is accurate.

9              **THE COURT:**  Okay.

10             Ms. Smothers?

11             **MS. SMOTHERS:**  Well, Your Honor, as I've

12   indicated, our objections were filed before either side,

13   the government or the defense, had ultimately obtained

14   those Maury County documents that are entered as exhibits

15   now.  And my initial objection was that we simply had a *pro*

16   *se* plea -- I'm sorry, a judgment that indicated *pro se*

17   without any other knowledge as to what happened.

18             But even in light of these documents which came

19   from the clerk, and Mr. Powell and I both received them and

20   we can't dispute those documents are the documents that

21   come from that prior court proceeding, then what you have

22   is a man who's 18 years old, apparently, as the event was

23   alleged to have occurred, 19 when he pled.  We still

24   maintain our objection that to have a knowing and voluntary

25   waiver -- and there's no doubt there was a waiver.  I mean

 1    it's signed.  It's got a check mark and he signed it.

 2              THE COURT:  And he acknowledged to the judge

 3    that he was doing that.

 4              MS. SMOTHERS:  Yes, sir.  Yes, sir, he did.

 5              THE COURT:  I probably would have asked him to

 6    say yes or no, but apparently the court picked up his nod.

 7              MS. SMOTHERS:  It indicates he was nodding.

 8              THE COURT:  He nodded yes on everything that he

 9    was asked by Judge Hamilton.

10              MS. SMOTHERS:  Yes, sir.

11              And again, there's no -- what we don't see --

12    and again, it's -- As he testified, you know, there's

13    very -- The plea, actually, the colloquy, is even more

14    limited and bare bones, if you will.  The documents

15    themselves actually have quite a bit more information than

16    the plea colloquy itself as far as background for the

17    waivers and those matters.

18              But I would still request Your Honor to

19    consider whether this admitted plea was a knowing and

20    voluntary waiver, not so much voluntary, but knowing,

21    again, with a man -- a young man who's 19 years old taken

22    to a county where he doesn't really have any contact,

23    apparently was there on a very minimal level, didn't even

24    know how to get back home or really where he was in

25    relation to Jackson, I think, once he stepped out of the

```
 1   courthouse.  That in that situation, in light of the
 2   constitutional aspect of it being a knowing waiver, there's
 3   no indication, and as he indicated, that he was under the
 4   influence of drugs or alcohol or something like that that
 5   would affect the voluntariness of it.  But as far as the
 6   knowing aspect, I think a barely 19-year-old defendant,
 7   admittedly without counsel, who apparently, other than
 8   being interrogated by the officers, literally never saw
 9   anybody for several weeks and then was brought to court and
10   this was done.  And I find that somewhat shocking.
11   Obviously, it's what happened, and the judgment went down.
12   It's long since expired.  I mean, the five-year supervision
13   was over, you know, years and years ago.
14            But, nevertheless, it's our position that
15   there's still a constitutional question as to whether it is
16   a knowing waiver, largely in light of his shockingly young
17   age.  He was an adult, absolutely, no doubt.  He's a
18   teenager but, legally, he's an adult.
19            THE COURT:  But is there anything -- I mean,
20   you know, you obviously pointed out he was 19 or 20,
21   whatever he was.
22            MS. SMOTHERS:  Nineteen, yeah.
23            THE COURT:  But what do I have in front of me
24   that indicates he didn't understand what he was doing?
25            MS. SMOTHERS:  I think just the totality --
```

 1              **THE COURT:**  Besides his age.

 2              **MS. SMOTHERS:**  I think just the totality, Your

 3   Honor.  And again, we're not saying he was, you know,

 4   kidnapped under cover of darkness and whisked away.  I'm

 5   not trying to imply that, but simply that he's taken

 6   halfway across the state to another county.  He apparently

 7   sits in jail for several weeks, close to a month, and then

 8   officers from either the county or the city, I'm not sure

 9   who, questioned him, and he's brought into court at some

10   later date.  It's obviously a docket or some type of a

11   routine report because the courtroom is full of people.

12   And then in a matter of minutes, okay, here's your plea.

13   You just go on home, head on home, get on a bus or

14   whatever.  He signs it and is gone.  And I think, again,

15   the -- I know the papers say he's literate.  There's no

16   dispute he was literate.  But again, given his -- given his

17   youth and the fact that he's away from home, had been away

18   from home for several weeks, apparently without contact,

19   basically, with anybody, just kind of waiting for someone

20   to take him on the next step to get him to court, I think

21   would go to whether the waiver was knowing.

22              And so we still maintain our objection as far

23   as that -- I say sentence, or the two matters that -- that

24   docket number 9311 counting as far as the armed career.  I

25   don't -- We have no other documentation to present.  I

1    think we set that out, basically, in our response, and Mr.

2    Powell has as well.

3              But I'd like to address the court, if I might,

4    regarding disposition.  I didn't know if Your Honor wanted

5    to wait till -- as far as where to serve the sentence and

6    that type of thing.

7              **THE COURT**:  We'll get to that in just a minute.

8              **MS. SMOTHERS**:  Yes, sir.

9              **THE COURT**:  Mr. Powell, is there anything else

10   you wanted to add?

11             **MR. POWELL**:  No, Your Honor.  Thank you.

12             **THE COURT**:  Well, the convictions which counsel

13   argues should not be, I guess, considered because they

14   were -- there's no indication they were knowing and

15   voluntary or that, I think, Mr. Lemons was too young or he

16   had been away from home or something of that nature, this,

17   as the court reviews the presentence report, was not his

18   first foray into the criminal justice system.  He had a

19   previous conviction in '95 for theft over $1,000.  He had

20   another conviction in '94 for driving offenses.  And he had

21   another conviction for aggravated burglary and carrying a

22   deadly weapon in '95 in Madison County.  So he had already

23   had at least three -- Let me make sure I'm not missing

24   something.  He actually had something as a juvenile, but at

25   least three adult convictions before he ever got to Maury

1    County and pled guilty to the two aggravated burglaries.

2            Before me, I have a document, exhibit 1, a

3    waiver of trial by jury and a petition to enter a plea of

4    guilty, that has a check mark, even though Mr. Lemons says

5    he didn't put some of this other information on here, but

6    where it's check-marked it says, I waive my right to have

7    counsel appointed for me, and then his signature, which he

8    admits that's his signature on there.

9            If that were in and of itself, there might be

10   some question, but I also have a transcript of the

11   proceedings on that day with Judge Hamilton where he

12   started out by asking him, said, Do you want to -- You have

13   indicated by signing the criminal information that you want

14   to proceed by that as opposed to having the case submitted

15   to the Maury County grand jury.  And he says:  Do you

16   understand that you have that right and you can waive that

17   and proceed by what we call a criminal information, and is

18   that what you want to do?  And Mr. Lemons acknowledges he

19   did.

20           Then he says:  Do you want me to allow that?

21   And again, he acknowledges that.

22           And then he also says:  You signed a document

23   that says you want to waive your right to trial by jury and

24   want to enter a plea of guilty.  Is that correct?  And the

25   defendant answers:  Yes, sir.

1        And then he says:  Do you understand what

2   you're charged with?  And he says:  Now, are you

3   represented by an attorney?

4        And I think Mr. Colbert, who I think was the

5   DA, I believe that's correct -- well, I'm not sure if

6   Mister -- Let's see.  There was someone by the name of Mr.

7   Colbert who steps in and says:  Judge, he wants to

8   represent himself.

9        And Judge Hamilton asked Mr. Lemons again:  All

10  right, is that correct?  And Mr. Lemons acknowledges that

11  he did.

12       (Reading) So, Mr. Lemons, you are representing

13  yourself today?  And again, he acknowledge that he did.

14       And Judge Hamilton said:  You understand if you

15  want a lawyer, I'll appoint you one, but do you want to do

16  it this way and represent yourself?  And again, Mr. Lemons

17  acknowledged that he did.

18       Then he went on further to say that he had a

19  right to a trial by jury, would appoint an attorney to

20  represent him there, that he can assist him with witnesses,

21  and then he goes through the other rights.  Then Judge

22  Hamilton asked him, he said:  Is there anything you don't

23  understand about what I just said?  And Mr. Lemons said no,

24  or shook his head no.

25       And then he proceeds to tell him what he's

1    being charged with.  Then he said:  Are you in fact guilty

2    of those charges?  That's correct?  And Mr. Lemons said

3    yes.

4            Then he asked him if he was promised or

5    threatened, had anybody done that, and he said no.

6            You know, with all of this information, not

7    only with the transcript and the -- in conjunction with the

8    Waiver of Trial by Jury and Petition to Enter Plea of

9    Guilty, it seems to me that Mr. Lemons made a knowing and

10   voluntary waiver of his right to counsel and that he freely

11   and voluntarily entered a plea of guilty to the charges in

12   1996, February 6, 1996, for two counts of aggravated

13   burglary, and the court will overrule the objection that

14   these were not appropriate or voluntary waivers, and I will

15   overrule Ms. Smothers' objection to that.

16           All right, what else?

17           **MS. SMOTHERS**:  Just if I can address Your Honor

18   concerning --

19           **THE COURT**:  Sure.  You can go ahead and do that

20   now.

21           **MS. SMOTHERS**:  Yes, sir.  Thank you.

22           Your Honor, in light of Your Honor's ruling,

23   obviously we're faced with, I would offer, a Draconian

24   sentence, a drastic sentence.  That's what the statute

25   provides, like it or not.  But, still, if you look at this

1    situation, Mr. Lemons' situation, individually in light

2    of -- and I think it's set out in the presentence report.

3    All of these events, '94, the event which gave rise to the

4    Maury County plea, happened in like January of '94.   Then

5    the -- it's paragraph 29 of the presentence report.   That

6    event happened in December of '94.   It was pled earlier,

7    but it happened later that same year.   So the Maury County

8    was the last plea, although it was not the last event to

9    occur in time.

10         But I say all that to say, basically, '96 even

11   comes too far forward.   You would say '94 is when those

12   events happened, the last of this conduct.   And as the

13   report sets out, and we can't dispute it, he was to be

14   supervised here.   He moved -- as the report indicates, he

15   moved out West and was apparently living there, working

16   there, did not get into trouble.   The report doesn't show a

17   bunch of arrests or problems or any kind of -- those type

18   of issues for years and years.

19         He comes back to Tennessee.   His mother lives

20   here.   She's here today.   And that's where his family --

21   where his mom is.   He comes back here, and it's my

22   understanding -- And the officers -- one of the officers is

23   here today.   But it's my understanding right before this

24   case came to be, there basically was a roundup, if you

25   will, of just old outstanding warrants that were sitting

1   around at the sheriff's department or the police department

2   in an effort to clean up files and address those hanging

3   matters.  There was a warrant for either absconding or

4   probation violation where -- because he was gone.  He

5   simply had not reported.  It would have been, I suppose, a

6   technical violation.  No new crime, if you will, but just

7   didn't report.  And they track him down through utility

8   records.  They go to his house.  He's there, and here we

9   are today.  The gun is found when they come to arrest him

10   on that old warrant.  It had been out since the late '90s.

11   It just had never been served on him but was still a valid

12   warrant, and that's what brought us here today.

13          Unfortunately, because of the statutory

14   construct of 924(e), he's facing a shockingly severe

15   sentence compared to someone who had maybe even less

16   history or somewhat similar history but, you know, went out

17   and robbed a bank or something.  I mean this sentence is

18   absolute.  It binds the court.  It's statutory.

19          And what I would ask Your Honor to consider as

20   far as service of the sentence, both where and the wording

21   of our order in relation to some of these other matters,

22   this man is not someone who's been out continuing to behave

23   in an unlawful way, other than being gone and not

24   reporting.  And clearly, that's a violation of his

25   conditions of probation.  We don't dispute that.  But he

1   wasn't out robbing banks, selling drugs, doing any of the

2   other things that folks could do in the intervening decade

3   and more, twenty -- a long time.

4         I say all that to say that paragraph 29, that

5   that sentence on June 28, '08, he was revoked to serve that

6   sentence.  It's my understanding that he had been paroled,

7   basically was paroled to the federal hold.  But regardless,

8   as Your Honor sees in the language, the sentence won't

9   expire until June 3, 2014.  I would ask Your Honor to

10  fashion this judgment, because of this long intervening

11  time -- and unfortunately, again, under armed career

12  criminal, they never age out.  If these convictions were

13  forty years old, he would be facing the same sentence.  If

14  he had led a 110 percent law-abiding life for forty years

15  post-plea, he'd be facing this same sentence.  There's

16  nothing else in the statute or guidelines that causes that

17  kind of result other than this armed career.  And I don't

18  think there's any other word other than Draconian to

19  describe that sentencing scheme.  But that's where we are

20  right now.

21        I would ask Your Honor to state in this

22  judgment, to rule that this sentence, whatever it may be,

23  is to be concurrent with and he's to be given sentence

24  credit for any time that he has served on paragraph 29,

25  that Madison County Circuit number 95-155.  Again, I think

1    Your Honor has discretion to fashion either a consecutive

2    or a concurrent sentence, to fashion this sentence in a

3    variety of ways.  But given the unusually long time line

4    without any indication of other illegal activity other than

5    he just didn't report, he moved away, and when he came back

6    years later, apparently, there he is not bothering anybody,

7    going to work, and we end up here today.

8              He has served -- He's been in custody since he

9    was arrested.  He has served, apparently, what the state

10   wants from him on that case; but, nevertheless, I'm

11   confident the Bureau of Prisons will not likely give him

12   credit for that time because it was credited on that case.

13             The same thing is true with paragraph 27, which

14   is those Madison County cases -- I'm sorry, which is that

15   Madison County case 94-1472.  Again, he's revoked June 28th

16   to serve the balance of that sentence.  It expired July --

17   It will expire July 9th of this year, 2010.

18             I'm asking Your Honor -- and it is somewhat

19   unusual, but I'm asking Your Honor to state in this

20   judgment that this sentence on the federal case is to be

21   concurrent -- well, maybe the better way to say that is

22   he's to be given sentence credit on the federal case for

23   any time he has served in custody on paragraph 29 or

24   paragraph 27, those Madison County cases, because, again,

25   this is -- I think it is an unusual case.  This man hasn't

1    been a thorn in the law enforcement side for fifteen years,

2    just kept getting in trouble until they finally caught him

3    with a gun.  He was doing nothing with the gun.  It was a

4    long gun, basically apparently there, I guess, for home

5    protection, as any number of folks have.  Unfortunately, he

6    can't have one.  But we'd ask Your Honor to state that he's

7    to be given credit on this sentence for any days he has

8    served on those sentences.

9              I would also request -- And again, the length

10   of the sentence may preclude this initially, but I would

11   still request on his behalf that Your Honor recommend that

12   he be housed at a low-security camp.  Again, I'm confident

13   the Bureau of Prisons administrative regs will prevent that

14   initially in this sentence, but at some point he will come

15   down to a term where he could be camp-eligible.  It's my

16   understanding that now, with a ten-year or less sentence,

17   that you would be normally considered for camp

18   participation or placement.  I would ask Your Honor to make

19   that recommendation, again, because of the unbelievable

20   length of time between these priors and where we are today,

21   where he was at the time that he was found with the gun,

22   which, hopefully, would assist him in being, I would offer,

23   in a housing situation and in a classification that would

24   more accurately reflect what he's been doing and who he is

25   as opposed to just the number of months on paper, which if

```
 1    you look at that just in a vacuum in the case, he's a
 2    really bad apple and there must be something awful going on
 3    because he's got this big sentence.  But again, he's just
 4    someone whose priors are never going to age out.  If he
 5    gets out and comes back in court at age 65 with a gun
 6    charge, he'd be looking at this same sentence.  It makes no
 7    difference.  And I would offer to you that's patently
 8    unfair, although that's what the statute says.
 9              But I think to avoid some of that, we ask that
10    Your Honor give him credit for any days served on those
11    sentences and make a recommendation for the camp and also
12    for substance abuse treatment.  I think there's
13    historically been an issue with that.  He may be largely
14    past it now, but we do request it on his behalf because
15    there has been an element of that in his past history.
16              That's all our requests today.
17         THE COURT:  Mr. Powell?
18         MR. POWELL:  Well, Your Honor, just two
19    matters.  I'll take them in reverse order of Ms. Smothers'
20    presentation.
21              I would submit to the court that because it is
22    an unusual case does not establish a lawful basis for a
23    lower sentence.
24         THE COURT:  I think she's wanting credit.  Not
25    necessarily concurrent, but credit, I guess.
```

1              **MR. POWELL**:  Well --

2              **THE COURT**:  Six one half dozen or the other.

3              **MR. POWELL**:  Call it credit, concurrent

4    sentencing, it is exactly what the court has just said.

5    And part of the factual basis that belies that reasoning is

6    her same argument that these happened so long ago, the

7    cases from '94 and '96.  It's hard to fathom how that makes

8    creditworthy in this case that it occurred when it did.

9              The other thing is Ms. Smothers' statement of

10   if he had lived a law-abiding life.  And if he had lived a

11   law-abiding life, he wouldn't be here today.  It's that

12   simple.  The reason that we are here with Mr. Lemons is

13   because he didn't do what he was supposed to do.  If he had

14   done what he was supposed to do, this case never would have

15   occurred.

16             **THE COURT**:  All right, sir.

17             Anything else, Ms. Smothers?

18             **MS. SMOTHERS**:  No, sir, Your Honor.

19             **THE COURT**:  Mr. Lemons, the court will permit

20   you to say anything on your own behalf if you wish to do so

21   at this time, sir.

22             I need something for the record.  Just tell me

23   you don't want to say anything.

24             **THE DEFENDANT**:  No, sir.

25             **THE COURT**:  You don't?  Okay.

1           All right, in this matter Mr. Lemons had

2   previously pled guilty to count 1 of the indictment

3   charging him with being a convicted felon in possession of

4   a firearm in violation of 18, United States Code, Section

5   922(g).

6           The court is utilizing the guidelines as

7   advisory, and in doing so I'm referring to the 2008 edition

8   of the guideline manual, which under that condition, under

9   Section 2K2.1(a)(4)(A), Mr. Lemons would be at an offense

10  level of 20.  However, based upon Section 4B1.4(b)(3)(B),

11  Mr. Lemons qualified as an armed career criminal because he

12  has had three or more violent felony -- excuse me, violent

13  felony offenses, which under 18, United States Code,

14  Section 924(e)(2)(A), would be subject to an enhanced

15  sentence, and that would place his -- actually, that's a

16  mandatory minimum enhanced sentence, and that would place

17  his offense level at 33.

18          And I'm assuming the government moves for

19  the -- You may have already moved for the additional point

20  under acceptance.  Did you, Mr. Powell?

21          **MR. POWELL**:  Yes, Your Honor.  I filed a

22  motion.

23          **THE COURT**:  All right, the court will grant

24  your motion and give Mr. Lemons a full three-level

25  reduction for acceptance.  That reduces his offense level

1    to a 30.

2              Under his criminal history category, he has

3    three criminal history points based upon the '95 aggravated

4    burglary and carrying a deadly weapon.  He also has two

5    additional points based upon the fact that at the time of

6    the instant offense he was on probation under Section

7    4A1.1(d).  That gives him five criminal history points.

8    That would have otherwise placed him in criminal history

9    category III, but because of the armed career criminal

10   status, he -- well, excuse me.  Because of 4B1.1(4)(c),

11   he's under criminal history category IV -- excuse me, under

12   criminal history category IV.  That, based on the guideline

13   range, his advisory range, under that scenario, would

14   recommend a range of 135 to 168 months.

15             The court is also to consider the factors under

16   18, United States Code, Section 3553(a), which directs the

17   court to impose a sentence sufficient but not greater than

18   necessary to comply with the purposes set forth in

19   paragraph (2) of the subsection.

20             The court, in determining the sentence to be

21   imposed, is to consider the nature and circumstances of the

22   offense and history and characteristics of the defendant.

23   Of course, the nature and circumstances I think have been

24   outlined here.  To my understanding, there was a joint

25   operation, I believe, by U. S. Attorney's office and -- or,

1    excuse me, I apologize, by the Madison County agents and --
2    local, state and federal, I guess.  It was a joint effort
3    among all three agencies to work various warrants.  And in
4    an arrest roundup in this area, Mr. Lemons was found based
5    upon -- I believe as Ms. Smothers indicated, for an
6    outstanding -- I believe it was a probation violation
7    warrant, and that in going to his residence there was found
8    a Hi-Point 9mm carbine rifle, and I believe the officers
9    knew that Mr. Lemons was a convicted felon.  And for that
10   reason he was prosecuted in this court for that particular
11   offense.

12          There was no indication that he was using the
13   gun in any other way.  He just had it, I guess maybe for
14   protection, not like some situations we find where someone
15   is utilizing it in conjunction with some other offense.
16   But nonetheless, Congress has seen fit to prohibit persons
17   who are felons from possessing or being around firearms.
18   And statistically, I guess that's an appropriate basis
19   simply because so many felons do, regretfully, commit
20   offenses with firearms or other destructive weapons and --
21   Anyway, certainly that's their prerogative, and which they
22   have done.

23          The history and characteristics.  Mr. Lemons,
24   as Ms. Smothers pointed out, the vast majority of his prior
25   record emanated from the '90s, and there's been no

1   indication of any subsequent -- Let me make sure I'm not

2   missing something here.  No indication of subsequent

3   arrests by authorities.  Picking up on what Mr. Powell

4   said, of course, that -- and as Ms. Smothers said, even if

5   he came back here again, he'd be under the same situation.

6   I mean Congress and sentencing creators have -- the

7   sentencing guidelines authors have seen fit to take those

8   matters in consideration and obviously have felt that

9   persons who have been involved in violent criminal offenses

10  and violent felonies in the past are subject to higher

11  sentences than those, obviously, who have not been so

12  involved.  So his past has caught up to some degree with

13  Mr. Lemons and will continue so because of his past

14  offenses.  But the court has to take that into

15  consideration and will do so in assessing the sentence in

16  this case.

17       The court is also to consider a sentence that

18  would reflect the seriousness of the offense, which I've

19  addressed, promote respect for the law, and provide just

20  punishment for the offense, which the court believes the

21  sentence in this case will do.

22       To afford adequate deterrence to criminal

23  conduct; basically, send a message to others that the type

24  of conduct as committed in this offense should obviously be

25  avoided and is not to be condoned.

1            To protect the public from further crimes of

2      the defendant is a somewhat equivocal factor based upon the

3      fact that Mr. Lemons has not -- at least based on the

4      information I've been provided, has not been involved with

5      the criminal justice system for several years.  I think he

6      may have made a lot of sunshine back in the '90s, but at

7      least he's tried to avoid it or has avoided it for several

8      years.  And if nothing else, that's certainly indicative

9      that maybe he's trying to move in a different direction.

10            Finally, provide the defendant with needed

11      educational, vocational training, medical care or other

12      correctional treatment, and the court can certainly craft

13      some conditions that I think maybe would help down the line

14      with Mr. Lemons.

15            This is a case -- I mean I'm somewhat

16      conflicted to some degree because of what appears to be a

17      relatively high sentence for this matter.  But, by the same

18      token, I'm obligated, certainly, to uphold the Constitution

19      and other laws that Congress has established, created.  But

20      hearing all of the arguments and testimony and other

21      matters that have been reviewed, and the presentence

22      report, the court is going to impose the following sentence

23      in this case.  I'm going to impose a sentence that I think

24      is sufficient but not greater than necessary to comply with

25      the purposes of 3553(a) and what the court is going to do

1    is impose a sentence of 150 months in this matter.  I'm

2    also going to place Mr. Lemons on a period of three years

3    supervised release, along with a $100 special assessment.

4    I'm not going to impose any fine.

5         I will recommend that he undergo the 500-hour

6    drug program and also that he will undergo drug treatment

7    and testing as deemed necessary by the probation office, as

8    well as cooperate in the collection of DNA.  Obviously,

9    he's not able to possess any firearms.

10        I will recommend at some point that he be

11   housed in camp housing, but I think at this point he's not

12   going to qualify for that, Ms. Smothers.  So I'll make that

13   recommendation.

14        I don't believe there was any plea agreement in

15   this case, was there?

16        **MS. SMOTHERS**:  No, sir.

17        **THE COURT**:  No.

18        All right, Mr. Powell, any other objections as

19   far as sentencing, any other matters I failed to address on

20   behalf of the government, sir?

21        **MR. POWELL**:  Did I understand that the court

22   sentenced to 150 months?

23        **THE COURT**:  That's correct.

24        **MR. POWELL**:  Below the 180 mandatory minimum.

25        **THE COURT**:  That's correct, under sufficient

1    but not greater than necessary to comply with the purposes
2    of 3553(a).
3                    MR. POWELL:  Well, pursuant to Bostwick, Your
4    Honor, the court is aware that the government --
5                    THE COURT:  You can take it up.
6                    MR. POWELL:  -- must object to --
7                    THE COURT:  Yes, sir.
8                    MR. POWELL:  -- the court's imposition of that
9    sentence.
10                   THE COURT:  I understand.  Anything else?
11                   Anything else from the defendant?
12                   MS. SMOTHERS:  No, sir.
13                   THE COURT:  You'll have ten days to appeal the
14   court's determination.  Fourteen days, I'm sorry, to appeal
15   the court's determination.  Here's a packet of information
16   for that purpose.
17                   All right, anything else?
18                   MS. SMOTHERS:  No, sir.
19                   MR. POWELL:  No, sir.
20                   THE COURT:  All right, you all are excused.
21          (Proceedings concluded at 2:05 p.m.)
22                              - - - - -
23
24
25

USA V. MICHAEL R. LEMONS
NO. 1:08-CR-10102-JDB-1

1                    REPORTER'S CERTIFICATION

2        I certify that the foregoing is a correct transcript

3    from the record of proceedings in the captioned matter in

4    the United States District Court, Western District of

5    Tennessee, Eastern Division.

6

7                                    **s**/Christine Martin, OCR

8

9                                    July 8, 2010

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                    SENTENCING HEARING PROCEEDINGS
                           MAY 13, 2010
                      UNREDACTED TRANSCRIPT